# CALEDONIA COUNTY,

## AUGUST TERM, 1861.

NATHANIEL L. MORGAN *v.* T. J. CREE, CHARLES ROGERS, JR., AND GEORGE GIFFIN, JR.

*Construction of the term Public Taxes, as used in Legislative Grant.*

The charter of the town of Wheelock, whereby the territory comprising said town was granted by the legislature to W. as president of Moor's Charity School, and to the trustees of Dartmouth College, his and their successors in office, declared that "the land and tenements in every part of said township, or precinct, shall forever be free and exempt from *public taxes*, that is to say, so long and while the incomes and profits shall be actually applied by said president and trustees, and their successors, to the purposes of said college and school." *Held*, that the term *public taxes*, was used in said charter in reference to taxes pertaining to the public revenue, as contradistinguished from local municipal taxes, such as town, parish, district, and village taxes, assessed upon, and to be expended for the use and immediate benefit of, the particular municipality.

CASE against the defendants as listers of the town of Wheelock, for appraising and setting in the grand list of 1858, one hundred acres of the plaintiff's land in said town, at the sum of $800, making a list of $8, by means whereof a tax of $3.28 was assessed by the selectmen against the plaintiff, to pay town expenses, for which the collector of said town, on the 23d day of April, 1859, distrained the property of the plaintiff, and afterwards sold the same to satisfy said tax and costs. At the June term, 1860, POLAND, J., presiding, the case was tried upon the following agreed statement of facts :

On the 14th day of June, 1785, the governor, council, and general assembly of this state, by charter of that date, reciting that Dartmouth College and Moor's Charity School, situated on the east

bank of Connecticut River, had been and were of important service in diffusing useful literature among mankind, and throughout this state in particular, and that the Hon. John Wheelock, for and in behalf of the trustees of said college, and in behalf of said school, had applied by petition for a grant of a tract of unappropriated lands within this state, for himself as president of said college and school, and his successors in office, and for the trustees of said college and their successors,—gave and granted unto the said Wheelock as president of said school, and to the trustees of said college, a certain tract of land therein described, containing about six miles square, and thereby incorporated the same into a township by the name of *Wheelock*, and declared that " the inhabitants that do or shall hereafter inhabit said town, or precinct, are hereby declared to be enfranchised and entitled to all privileges and immunities that the inhabitants of other settled towns within this state do by law and the constitution thereof, exercise and enjoy." *Habendum :* " The said Wheelock as president, and for his successors in office, to have and to hold the one moiety of said premises as above described, solely and exclusively for the use and benefit of said school forever ; and the said trustees and their successors in office, to have and to hold the other moiety solely and exclusively for the use and benefit of said Dartmouth College forever. All the privileges and appurtenances thereunto belonging and appertaining, are hereby also granted to the said president and trustees for the purposes aforesaid, on the following conditions and reservations, viz : that one hundred and fifty acres of land be reserved for the use, benefit, and support of the ministry of the gospel in said township, or precinct, forever ; one hundred and fifty acres of land for the use and support of an English school or schools in said township, or precinct, forever ; to be located as near the center of said township, or precinct, (on good tenantable land) as the situation thereof will admit ; and whereas the said grant of land is for a public and important use, it is hereby declared that the land and tenements in every part of said township, or precinct, shall forever be free and exempt from public taxes, that is to say, so long and while the incomes and profits shall be actually applied by said president and trustees, and their successors, to the purposes of said college and school as above expressed."

Said college and school have long been and now are incorporated by law, and located at Hanover, N. H., and they commenced leasing said lands in 1794, for the term of 998 years, and have continued to lease the same down to within a few years, for about the same term of time—at first requiring the lessees to

pay $6 annually per 100 acres , and lately, to pay $6.67 per 100 acres; this last sum being the legal interest of one hundred crowns, they valuing the land at one crown, or $1.11, per acre. They made a provision in their leases from 1794 to 1830, giving the lessees the privilege of paying a sum of money that would be equal to one crown per acre, and if the lessees so paid, the college and school would relinquish and quit-claim the rent reserved for the remainder of the term; and also provided in all the leases, except one, that in case of the payment of the capital, or any part thereof, 'the said college and school thereafter should not be liable for the payment of any tax or taxes which might be assessed or levied on the land, and in some of their discharges, they made the same provision against the payment of taxes.

Since 1830, said college and school have left out the provision relating to the paying up of the capital, and the provision relating to the payment of taxes; but have continued to take the capital of the lessees, when offered, and to discharge future rents. In 1851, the college and school made application to the legislature of this state, and procured the passage of an act enabling them to convey to the lessees in fee simple, their lands, and also to convey in the same manner to any person, the lands unsold; since which, they have conveyed in this manner by warranty deed when desired so to do.

There are about 24,000 acres of land in the township; on sixteen 24ths of which the capital has been paid or otherwise discharged; six 24ths of which are now paying rent to the college and school, and two 24ths are now unsold, and is the property of said college and school, and is unimproved.

The town was organized March 29, 1792, and has ever since kept up and maintained its organization as a town. From 1792 to 1819, inclusive, the improved land and the buildings in said town, were set in the grand list thereof, for town, school, and highway taxes; but in the grand list returned to the legislature for state taxes, the land and buildings were left out. Since and between 1820 and 1858, the land and buildings have been left out of the list for all purposes of taxation.

In 1857, the legislature of this state passed an act, approved November 10, 1857, for the relief of the town of Wheelock, authorizing the town, under certain regulations, to appraise and set in the list the lands held under lease or leases from Dartmouth College and Moor's Charity School—said list, with the land included, to be used to raise money to pay town expenses, school district taxes, and highway taxes; under which the town has since appraised and set the land in the list, following in all things the

requirements of said act. The listers deducted from the appraisal of the lands paying rent, the capital of one crown per acre, and set the balance of the value in the list to the owner thereof; those lands with the capital paid up, were set in the list at their fair cash value; the 2,000 acres owned by the college and school, and unleased and unsold, not being appraised or set in the list. Said college and school have expended and appropriated the funds received of the lessees for capital, to their common purposes and expenses, that is, in payment of the salaries of the professors and other necessary expenses, though a separate account has been kept with the Wheelock lessees, so that payments of rent and capital may be distinguished and separated at any time. It is conceded by the defendants, that the plaintiff was the owner of one hundred acres of land in Wheelock, which he and his grantors held under title by lease for 998 years, originally to Daniel Cross, from Dartmouth College; that the defendants, as listers as aforesaid, appraised the same at $800, the said land being crown free and paying no rent; that the defendants as listers as aforesaid, in 1858, set the same in the grand list of that year at $8, being one per cent. of the appraised value; that the selectmen of said town, in order to raise a sum of money voted by said town to pay town expenses, assessed a tax of 41 cents on the dollar of said list, making a tax of $3.28 against the plaintiff, which sum, with others, the selectmen placed in a tax-bill, with a warrant for collection, directed to Rufus M. Hubbard, collector of said town, who, on the plaintiff's refusal to pay said tax, distrained two buffalo robes and one saddle, the property of the plaintiff, and sold the same to satisfy said tax and costs. The court rendered judgment, *pro forma*, for the defendants; to which the plaintiff excepted.

*E. A. Cahoon* and *T. P. Redfield*, for the plaintiff.

It has been, we think, uniformly held, that a grant of land by a sovereign state, providing and enacting in the grant that the land which is the subject of the grant, shall be forever exempt from taxation, is a *contract*, within the meaning of the constitution of the United States. *Fletcher* v. *Peck*, 6 Cranch, 87; *State of New Jersey* v. *Wilson*, 7 Cranch, 164; *Terrett et als.* v. *Taylor et als.* 9 Cranch, 43; *Dartmouth College* v. *Woodward*, 4 Wheat. 578; *Wales* v. *Stetson*, 2 Mass. 143; *Green* v. *Biddle*, 8 Wheat. 1; *Gordon* v. *Appeal Tax Court*, 3 How. 133; *State Bank* v. *Knap*, 16 How. 386; *Herrick* v. *Randolph*, 13 Vt. 529; *Atwater*

v. *Woodbridge*, 6 Conn. 223 ; Smith Com. 404 ; *Osburn* v. *Humphrey*, 7 Conn. 335. But it is claimed that taxes assessed to defray *town* expenses, are not "public taxes." The tax is imposed by the authority of a public statute enacted by the same sovereign power which made the grant ; the same authority that imposes a tax for the support of schools ; and the only difference is, that the one delegates to the town to assess the amount, the other is fixed in the law itself. A tax assessed and enforced under the authority of the law of the state, is a "*public tax.*" It is used, probably, in contradistinction from proprietary and conventional taxes.

The plaintiff's title to the land assessed, was derived from the college by a lease for the term of 998 years, reserving annual rent to the college. Thus far the " income and profits are actually applied to the purposes and for the use and benefit of said college." But subsequently the plaintiff paid the college a sum of money, the interest of which was the amount of rent reserved, and in consideration thereof, the college *discharged future rents.* The relation of the parties is the same as before—the rent for the whole term has been paid in advance, and that sum " applied to the purposes and for the use and benefit of the college."

The listers of Wheelock, under the act of 1857, have appraised all the lands leased by the college and school, and set them in the list; the plaintiff's land at full value; and where the rents have not been paid for the term, they have deducted from the appraisal a sum, the *interest* of which would be the *rent reserved.* The state makes no distinction, and we think no legal distinction exists. If the state can impose taxes upon the one, it can upon the other. The cases of *Dartmouth College* v. *Woodward*, and *State of New Jersey* v. *Wilson*, are sufficient authority that the exemption in the grant is a *contract*, and upon *sufficient consideration.*

The lease was executed upon the faith of the state, that the lands were exempt from " public taxes." The plaintiff's title, rights, and interest, exist solely under and by virtue of the lease. The fact that a party paid two years' or ten years' rent at one time or in advance, could have no effect upon the title. Nor could the fact that such *accumulated rents* were applied with other funds to

99

pay for a *college building*, or to cancel a debt that had accrued, or for a new *professorship ;* in each case, " the *income* and *profits*" have been "applied for the *use* and benefit of said college." And the court will *presume* that the income and benefits *paid* to the college, have been " *applied to the use and benefit* of the college" —having been paid to the officers of the college, and paid to meet its current expenditures.

If it be said that a lease for a long term, and the rents *afterwards* discharged, is tantamount to a *conveyance in fee*, it is an obvious reply, that the provision in the charter, that the land should be *exempt from taxes, was*, and will be *presumed* to be, an important element in the *contract*, and did much enhance the *value* of the land, and thereby enable the college to obtain *higher rent*.

If it be conceded that the contract as evidenced by the lease, is protected from " unfriendly legislation," it would seem a legal sequence that a subsequent payment of the whole rent in gross, does not change the nature of the *contract*. Nor are such rents used in gross by the college, less " applied for the *use* and *benefit*" of the college.

The charter declares the grant to be for a public and important·" *use ;*" " to hold solely and exclusively to the *use* of said school and college." This created a trust ; and the trustees could, neither with nor without the consent of the legislature, pervert or impair the trust ; they could not alienate the title. *Montpelier et als.* v. *East Montpelier et als.* 27 Vt. 704.

The charter, to render the *use* more beneficial, declares the land forever free and exempt from " *public taxes*," and adds,— " that is, so long and while the income and profits shall be actually applied," &c. But this neither enlarged nor restricted the *duty* of the trustees. They were *bound*, it was a *trust-duty*, so to apply *the fund ;* and an attempt to pervert it, would be utterly void.

*T. J. Cree* and *Peck & Colby*, for the defendants, contended 1st ; that the legislature had no authority to exempt the town of Wheelock from the payment of state taxes, and submitted that a restriction of the rights and powers essential to the ex-

ercise of the grant, which amounted to a total exemption from taxation, would be void, as subversive of the grant, and wholly repugnant thereto.

2. The second question to be determined, and the one of most importance is, did the legislature intend to exempt these lands from the payment of all taxes? The defendants insist it did not. This question must be determined by the construction to be put upon the charter and act of incorporation. From the language used, it is evident that the legislature meant to discriminate as to the kind of taxes, from the fact that the word *public* was used. If all taxes were meant, it was inconsistent to use the word *public;* and if all taxes were meant, the words *taxes,* or *all taxes,* would have been used.

Legislative bodies frequently use the terms, public welfare, public good, public service, public debt, public charges, public papers, public money, public taxes, &c.; no reasonable construction can be put upon these expressions, other than that they mean matters and things pertaining to the state at large, the whole community, and opposed to things of a more private character, belonging to towns, corporations, companies, and individuals. Sts. of 1787, 144–147; 2 Sts. of 1808, 190, 201, 217, 247, 251, 325, 327. The framers of the constitution used the terms, "public taxes," "public moneys," in defining the duties of the council of censors. "They are also to inquire whether the *public taxes* "have been justly laid and collected; in what manner the public "moneys have been disposed of." Can it be said that public taxes here means any other taxes than state taxes, or public moneys any other than that belonging to the state?

In 1791, the legislature of this state founded and incorporated the University of Vermont, and made grants of land to it. In 1800, the legislature also incorporated a college at Middlebury. The lands, &c., of both these institutions were exempted; the first, to the amount of 100,000 *l.;* the second, of the yearly value of $2,000. There was in neither case, no discrimination made in the kind of taxes. In the first case the legislature said, "exempt from taxes," and in the latter case, "exempt from all taxes." 2 Sts. of 1808, pp. 87–92. Hence, we insist that the legislature,

ˏby this charter, did not exempt the lands in Wheelock from any taxes except state taxes, and these are called public taxes, the only taxes the legislature could impose at that time.

The charter and act of incorporation are in the nature of a contract, and if it can be said to be ambiguous, then the subsequent acts of the parties to it may be considered in construing it    The town of Wheelock was made a party to this contract at the time of its execution in 1785, and in 1792 it was affirmed on its part, by organizing under it, and it is evident from the subsequent acts of the town, that it did not understand the charter to mean that it could not assess and tax these lands to support and maintain the organization of the town.

It is also evident from the charter, that the legislature meant to and did limit and prescribe the time in which this exemption from state taxes should exist. It says: " So long and while the incomes and profits are actually applied to the purposes of said college and school." It is also evident from the subsequent acts of the college and school, that they understood the charter as above, and that they expected and were willing these lands should be taxed, manifesting their willingness and expectation from the very outset, showing clearly by their acts, that if they took the capital and discharged the rents, taxes would be levied by the state. This provision in their leases for the first thirty years, relating to taking the capital of the lessees, and the provision absolving themselves from the payment of taxes thereafter, show this.    Their procuring the passage of the act of 1851, authorizing them to convey over to the lessees in fee simple, their lands, shows it ; and by this last act of theirs, showing further, that they were willing to do away with this kind of tenure so repugnant to the feelings of the people of a free government, and put it beyond question as to the right to tax their lands for all purposes, and allow Wheelock to be a town among other towns, and pay her share of the public taxes.

The town of Wheelock was by the legislature declared to be enfranchised, and entitled to all the privileges and immunities that other towns in the state, by law and the constitution, exercised and enjoyed,—and we insist that, to assess all the property within

the town for town purposes, is a privilege that other towns enjoy. And we also insist that to assess the property and persons within the town to raise money to defray the expense of their own internal police, and enable them to perform the duties and obligations that the laws of the state and humanity impose upon towns, is a right incident to them as a corporation, and need not be specially granted. Corporations could not exist without this right. And it is unreasonable to suppose that the legislature intended to create the town of Wheelock as a corporation, and by former and subsequent statute laws, compel it, as other towns, to build roads and bridges, support schools, support their poor, and do various other things, or be liable to indictment, and at the same time take from it the common and ordinary means of raising money to perform these duties and obligations. By their act of 1857, they virtually say they meant no such thing.

If our construction of the charter is right, the act of the legislature of 1857 neither adds to or takes from the rights of the parties under their charter of 1785; the only effect or intent of that act was and is, to relieve the town of Wheelock from the operation of the general listing law of the state relating to property exempt, which, from the wording in 1825, and made still more plain in 1841, clearly prevented these lands from being set in the list for any purpose of taxation. Rev. Sts. 538–9; Comp. Sts. 451; Act of 1855, pp. 46, 47.

3. This general exemption is no part of the original contract with the college and school, not having been made at the same time, nor by the same parties. It is but a general law of the state, and like other laws, subject to alteration or repeal by subsequent legislatures. *Herrick* v. *Randolph,* 13 Vt. 525. The act of 1857, for the relief of Wheelock, is an act of justice and equity to the town, and was within the power of the legislature to pass. It impaired no contract or obligation expressed in the charter, and is an act of which the plaintiff has no just cause to complain. The town is compelled to build roads and bridges, keep them in repair, and do many other things to increase the value of plaintiff's real estate, afford it protection, and enable him to enjoy it; and he, in justice and equity, should contribute to the expense thereof.

*Catlin* v. *Hull*, 21 Vt. 152. In all the great leading cases where the question of vested rights, and of impairing the obligation of contracts, has been discussed and determined, to wit, *Fletcher* v. *Peck*, 6 Cranch, 87 ; *State of New Jersey* v. *Wilson*, 7 Cranch, 164 ; *Dartmouth College* v. *Woodward*, 4 Wheat. 518 ; the terms of the contract were clearly made and expressed, and as clearly violated and impaired. In some of them the breach went to the whole grant.

4. The case shows that on sixteen 24ths of the whole township, the capital has been paid to the college and school, the plaintiff's land being a part of this amount, no rents being paid on any of it. The case also finds that the college and school have expended the money thus received for the capital ; consequently, so much of the fund has been used up, and the incomes and profits named in the charter, have ceased to accrue and cannot be applied to the use and benefit of the college and school. The time limited by the charter has expired, and subjects these lands to taxation for public purposes.

The conditions beneficial to the grantee, are annexed to the grant itself, and with that, the grantee should be content, and cannot claim in addition, privileges embraced in general enactments existing at the time of the grant, and not expressed therein. But if allowed to hold these also, they are liable to be, and may be, altered by subsequent legislatures, unless they are perpetual. *Herrick* v. *Randolph*, *supra*. So that if the exemption laws in force at the date of this charter, are allowable as a part of its condition, the act of the legislature in 1857, for the relief of Wheelock, is not unconstitutional ; because, by the doctrine laid down in *Herrick* v. *Randolph*, the legislature had the right to alter the general listing law in this respect, the former law not being made perpetual. And in order to make the act of 1857 unconstitutional, the plaintiff must show that it affected a condition expressed or implied in this grant, and one insuring to him perpetuity in the existing law at the time of the grant.

The opinion of the court was delivered by

PECK, J. The grievance complained of is, that the defendants as listers of the town of Wheelock, set the plaintiff's land, situate

in Wheelock, in the list of that town for the assessment of town taxes; and that in consequence thereof, town taxes were assessed upon it against the plaintiff, and collected by the sale of the plaintiff's property. The ground upon which the plaintiff claims to recover is, that the land, by the original charter of the town, is exempt from such taxation, and that therefore it was wrongfully set in the list. It appears by the charter of the town, dated June 14, 1785, that the state of Vermont granted the town of Wheelock to Dartmouth College and Moor's Charity School, reserving one hundred and fifty acres for the use, benefit, and support of the ministry of the gospel in said town, and one hundred and fifty acres for the use and support of an English school or schools in said town. The charter also incorporates the territory granted, into a town, by providing that " the inhabitants that do or shall hereafter inhabit said town, or precinct, are hereby enfranchised and entitled to all privileges and immunities that the inhabitants of other settled towns within this state do by law and the constitution thereof, exercise and enjoy." The charter provides that, " whereas the said grant of land is for a public and important use, it is hereby declared that the land and tenements in every part of said township, or precinct, shall forever be free and exempt from public taxes, that is to say, so long and while the incomes and profits shall be actually applied by said president and trustees, and their successors, to the purposes of said college and school as above expressed." The plaintiff derived his title from the original grantees under the charter, and claims it is exempt from the tax in question under the foregoing provision. The town having been organized in 1792, from that time down to 1820, set the lands in the list, and assessed town taxes thereon, leaving the lands out of the list returned to the legislature for state taxes; and from 1820, omitted to tax the lands till the legislature passed the act of 1857, providing for assessing taxes on such lands for local purposes of the town. After this act was passed, the defendants set the plaintiff's land in the list as already stated, which is the grievance complained of. The charter was issued by virtue of an act of the legislature, passed at the June session thereof, 1785, granting the land and requesting the governor and council

"·to issue a charter of incorporation for the same," the act saying nothing as to exempting the land from taxation. Vermont State Papers, 497. One of the main questions presented by the case and in the argument is, whether a town tax is a public tax within the meaning of the charter exempting such land from "*public taxes.*" It is claimed on the part of the plaintiff that the word *tax, ex vi termini,* imports a public tax. It is true, a *tax,* in its ordinary acceptation, is a sum imposed or levied by government or other authority. It is a general term applied to whatever is required by the government or local authority thereof to be paid by the people. It presupposes that the burden is imposed by some authority other than that of the individual taxed, else it would not be a tax, but a voluntary contribution. So too its object, or the purpose to which it is applied, is to some extent public; that is, its use is not confined exclusively to the benefit of the particular individual tax-payer, but extends to some common object in which more or less individuals have an interest. Yet, it is obvious that a tax may be so levied, and so limited in its character and object, as not to be a public tax; and this idea must have been in the mind of the parties to this grant; otherwise, the word *public,* in the clause of exemption, is without meaning. Indeed, this is virtually conceded in the argument for the plaintiff; for it is contended that the phrase "*public taxes,*" is used in the charter in contradistinction to proprietary taxes imposed about that period by the proprietors of towns, on their common lands, for their common benefit. It is also claimed that town taxes are public taxes, because, although voted by the inhabitants of the town, or assessed by its officers, the authority to do so is derived from a public source, the legislature. But it is evident that this is not decisive; for all power of taxation emanates from the sovereign power, either state or national. The land proprietors under town grants, along about the period of the date of this charter, were in the habit of voting taxes upon the common property, to defray the expenses of surveys, for laying out roads, and other purposes for the benefit of their common property, and to facilitate the sale and settlement of their lands; but the power was given by statute. It is conceded that such taxes were not of

such a character as to come within the exemption in the charter. The word *public* is used in a more restricted or comprehensive sense, according to the subject to which it is applied. A private corporation sometimes possesses a limited power to tax its members, derived from the state which grants the charter; yet a tax imposed by such corporation by virtue of such delegated power, would not be a public tax.

It is claimed by defendants' counsel, that as the charter contains a grant of corporate powers as a town to the inhabitants of the territory granted, with all the rights and privileges of other towns, the exemption of all the lands and tenements in the town from town taxes, would be void, as being repugnant to the charter, so essential is the power of taxation of such property to the existence of the corporation, and the discharge of its municipal obligations; and if not so, still, that the court ought to put such a construction upon the charter as to avoid such consequences as would follow from the plaintiff's construction. We cannot say that such exemption of the real estate would so far deprive the town of the means of performing the duties and obligations incident to the existence of the town as a corporation, as to render such provision in the charter void merely for repugnancy. The town would still have the same power of taxing the persons and personal property of the inhabitants of the town, as is possessed by other towns. But if the language exempting all the lands and tenements from public taxes, is susceptible of two interpretations, the defendants have a right to insist on that construction which would give that effect to all the provisions of the charter most consistent with its intent. It is true that if we hold that the lands and tenements are exempt from town taxes, the grant of all the rights and privileges possessed by other towns cannot have full and complete effect, but would be restricted to an extent embarrassing to the town; but if we hold that town taxes are not included in the exemption clause, the town is invested with all the rights and privileges of other towns; and this consideration favors the construction claimed by defendants, and is a strong argument in its favor. But if the words " public taxes" are susceptible of but one interpretation, and necessarily include town taxes, then, al-

100

though they are to some extent repugnant ьo the general grant of corporate powers, they must have the effect to limit this general grant of corporate rights and privileges, as the special provisions must be construed as qualifying the more general words of the grant. But the word *public*, as applied to taxes, has no such fixed and settled meaning as necessarily to include town taxes within the words " public taxes" used in the charter. The word *public* is used variously, depending for its meaning on the subjects to which it is applied. Public law in one sense is a designation given to international law, as distinguished from the laws of a particular nation or state. In another sense, a law or statute that applies to the people generally of the nation or state adopting or enacting it, is denominated a public law, as contradistinguished from a private law affecting only an individual or a small number of persons. There is a material distinction between public and private statutes; and the books contain definitions of each, and abound with cases explaining the distinction. It is easy to illustrate this distinction by stating plain or extreme cases; yet cases often arise under statutes partaking so much of the character of each, as to render it difficult to decide to which class the particular statute belongs. The terms *public debt* and *public securities*, used in legislation, are terms generally applied to national or state obligations and dues, and would rarely if ever be construed to include town debts or obligations; nor would the term *public revenue* ordinarily be applied to funds arising from town taxes. The question is not entirely free of doubt, what is or is not included in the term *public taxes*, where used in public grants or legislative proceedings. A state tax would clearly be of that character, levied by the legislature of the state for the general purposes of the state, embracing the people of the state at large. A town tax, in one view, seems to partake somewhat of the same character, its purpose being to defray the expense of the town organization, and to enable it to perform its duties and discharge its obligations imposed upon it as a municipality constituting a part of the polity of the state. On the other hand, it differs materially from a state tax; it is levied by the town, or assessed by its officers; its purpose is not the direct benefit of the people of

the state generally, but local in its use and purpose, affecting directly the property and people of a small municipality. We think the words "*public taxes*" in the charter, are open to construction as to whether they were used in the sense of including, or in the sense of excluding, town taxes. Many considerations are urged on both sides as bearing on the question. The user under the charter is relied on by both sides. The defendants rely on the user from the organization of the town in 1792 to 1820, setting the lands in the town grand list and. assessing town taxes thereon, leaving out such lands in the list for state taxes. When the sense in which a word or words are used in a public charter or grant, is open to construction, the contemporaneous construction for a long period of time, by the user of the parties under it, is entitled to great weight in the interpretation of it, especially if it is of ancient date. In this case the omission to thus tax the lands from 1820 to 1857, lessens the weight of the evidence derived from the earlier user, but does not destroy its force. The practical construction of the charter by the parties in interest, in effect treating town taxes as not included in the exemption for more than a quarter of a century immediately succeeding the organization of the town, commencing so soon after the date of the charter, is entitled to weight in favor of this construction, notwithstanding the later usage. In construing public charters at a time long after their date, reference should be had to the condition of things, and the circumstances existing, at and about the time of their date. In determining whether a town tax is a public tax within the meaning of the charter, it is proper to consider how it was regarded in that respect at the period of time about the date of the charter, and whether it was then included in what was generally denominated public taxes. At that time, the general rights and powers of towns as to the purposes for which they might levy taxes, were not as clearly settled and defined as at the present time. Hence we find frequent statutes about that period, authorizing towns and other communities to levy and collect taxes for particular purposes. In relation to many subjects, the right to raise taxes was given to towns, and also to other communities or *quasi* corporations for the same object. The country was new,

and much of the land that had been granted was wild and unsettled, and the title to which was held by the original proprietors under their charters in common and undivided. These proprietors were often invested with power to levy taxes on these lands held in common, to lay roads, and for other purposes, to promote the sale and settlement of their lands. Towns at the same time had power to raise taxes for many of the same purposes. Towns and parishes were by statute given power to raise taxes to build meeting houses, and for the support of a minister of the gospel, on the polls and ratable estate of the inhabitants; towns in some instances being divided into parishes for that purpose, and the power was extended to communities in places not in any organized towns, to raise money on the polls and ratable estate of the persons associating. The acts of the legislature about the time of the date of this charter, and so near the time of its date as to have some bearing on this question of construction, have been examined to some extent, some of which have been referred to in argument, to see in what sense the words *public tax,* were used at that period. Nothing is found in this legislation specifically defining what tax shall be deemed a public tax; but the manner in which state taxes and town taxes are spoken of, furnishes reason to infer that the term *public tax,* when used at that period, had reference to state tax, and not understood as including town tax. Some of these statutes relating to levying and collecting taxes, expressly denominated state taxes, *public taxes,* that is, use these terms apparently as synonymous; while town taxes, when spoken of in the same or in other acts, are not so designated, but are classed with parish, district, society, and other local taxes. From this it is not unreasonable to conclude that the term public taxes, was used at that period as applicable to state taxes pertaining to the public revenue, and not as including town and other municipal taxes. *Shoalwater* v. *Armstrong,* 9 Humph. 217, is an instance of the interpretation of the term *public taxes* in this restricted sense. It was decided in that case, that the statute passed in 1844, providing "that in all cases of sales of land hereafter made for public taxes under the provisions of the laws now in force," the sheriff's or collector's deed reciting the facts necessary to make a valid sale

and convey a good title, should be *prima facie* evidence of such facts, did not apply to a sale for a *town tax*, for the reason that a town tax was not a *public tax*. This case may not be decisive of the sense in which the words in question in this charter should be construed, but it bears strongly in favor of the defendants' construction. To determine this question of construction, it is proper to look at the object and purpose of the exemption, and see what interpretation of the words in question, will secure to the grantees the immunity intended, and at the same time not to transcend it. The object was to make the grant more available to the grantees, by relieving the property from some burden for the support of government, to which other property of the kind was subject. The land was then mostly wild and uncultivated. It is manifest that relieving the land from state taxes, would operate beneficially to the proprietors, by affording an inducement to persons to take leases on terms more favorable to the proprietors, and become settlers in the town. It must have been desired and expected by the grantees in the charter, that lessees under them would become settlers upon the land and inhabitants of the town, and thereby facilitate the settlement of the town and make the grant more available. This exemption from state taxes is valuable to the grantees in the charter, because it is valuable to the inhabitants of the town who may hold under them. The exemption of the lands from state taxes, would tend to induce people to take leases under the grantees in the charter, and to become inhabitants of the town ; the two things which the grantees in the charter would desire. But no such benefit would arise or have been expected from an exemption of the land from town taxes. The charter contained a provision that the territory granted " be and hereby is incorporated into a township by the name of Wheelock," and declared the inhabitants thereof entitled to all the privileges and immunities that the inhabitants of other settled towns exercise and enjoy. This necessarily imposed upon such inhabitants all the duties, obligations, and burdens which, by the constitution and laws of the state, were or should be cast upon other towns. The necessary means for discharging these duties, must be raised by taxes upon the persons and taxable property of the inhabitants. The aggre-

gate expense for this purpose to be borne by the inhabitants, is not lessened by exempting the land from town taxes ; it only throws the more upon the persons and personal property of the inhabitants, the great mass of whom must necessarily have been expected to be owners or holders under leases from the grantees in the charter, of most of the lands in the town. It is difficult to see how the perpetual exemption of the land and tenements from town taxes, claimed by the plaintiff, could have been regarded as an immunity beneficial to the inhabitants of the town holding under the grantees in the charter, to any desirable extent. Such exemption from town taxes in a grant of a lot, or a small portion of the town, would be beneficial to the grantee ; but it is different when the exemption applies to the lands and tenements of the entire township, thus depriving the inhabitants of the entire power of taxation of the lands as a means of discharging their municipal obligations as a town, and casting it on their persons and personal property. It is not reasonable to suppose that such an anomalous municipality was intended to be created by the charter.

· In the case of the *Providence Bank* v. *Billings & Putnam*, 4 Pet. 514, MARSHALL, Ch. J., in reference to the relinquishment by the state of the right of taxation as to certain property, says : " It would seem that the relinquishment of such a power is never to be assumed. We will not say that a state may not relinquish it ; that a consideration sufficiently valuable to induce a partial release of it, may not exist ; but as the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the state to abandon it does not appear." It is a rule, that public grants, especially where some special privilege is granted or claimed, be construed beneficially in favor of the public, and strictly against the grantee ; and where susceptible of two interpretations, one more extensive and the other more restricted, that most favorable to the public is adopted. This is the general rule both in England and in this country ; although it has often been unsuccessfully claimed in argument, as in *Charles River Bridge* v. *Warren Bridge et al.* 11 Pet. 420, that this rule ought not to apply in this country, because

here, public grants are made by the people through their representatives.

The conclusion is, we hold that the term "public taxes," was used in the charter in reference to taxes pertaining to the public revenue, as contradistinguished from local municipal taxes, such as town, parish, district, and village taxes, assessed upon, and to be expended for the use and immediate benefit of, the particular municipality. This construction satisfies the language and accomplishes the purpose of the exemption, and is in harmony with the rule of interpretation applicable to the case. Other important questions have been discussed in the case, but as the decision of this question in favor of the defendants, is decisive of the case, there is no necessity of deciding the other questions raised.

Judgment of the county court for the defendants is affirmed.